IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH 1998 SESSION

FILED

October 9, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9704-CC-00151 |
| | ) | |
| | ) | Humphreys County |
| v. | ) | |
| | ) | Honorable Robert E. Burch, Judge |
| | ) | |
| SHARON LEMING, | ) | (First degree murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Lionel R. Barrett, Jr.
Washington Square Two
222 2nd Avenue, North
Nashville, TN 37201

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Ellen H. Pollack
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Dan Mitchum Alsobrooks
District Attorney General
Court Square, P.O. Box 869
Charlotte, TN 37036
        and
George C. Sexton
Assistant District Attorney General
Humphreys County Courthouse
Waverly, TN 37185

OPINION FILED:_____

REVERSED AND REMANDED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Sharon Leming, was convicted by a jury in the Humphreys County Circuit Court of first degree murder. The defendant received a sentence of life imprisonment in the custody of the Department of Correction. In this appeal as of right, the defendant presents the following issues for our review:

> (1) whether the evidence is sufficient to support the conviction;
>
> (2) whether the trial court erred by concluding that the defendant was competent to stand trial; and
>
> (3) whether the trial court erred by admitting into evidence statements made by the victim, Chris Leming.

We reverse the judgment of the trial court and remand the case for a new trial.

The defendant was tried for the murder of her husband, Chris Leming, that occurred either late September 11 or early September 12, 1995. Humphreys County Sheriff Ronnie Toungette testified that on the morning of September 12, 1995, Chief John Ethridge requested that he come to McEwen, Tennessee, to meet with Chester Duffield, the defendant's father. He stated that he went with a former deputy, J.C. Damesworth. He said that Mr. Duffield wanted them to follow him to the home of the defendant and victim in McEwen because he was worried about the defendant. He stated that when they arrived at the house, they called out but received no answer, and all the doors were locked. He testified that he looked in the bedroom window and saw two bodies lying in bed. He testified that he entered the house through the kitchen window, and once inside, he made his way to the bedroom where he discovered both the defendant and the victim lying in bed with serious head wounds. He stated that there was blood everywhere, and the victim showed no signs of life, but the defendant moaned and was breathing. He said that he told Damesworth to call an ambulance.

Officer Toungette testified that he checked the house for forced entry, but everything looked normal and secure. He stated that he found a bloody handprint on

2

the corner of the wall beside the bed. He stated that he also found a handgun and a purse lying on the floor next to the bed on the defendant's side. He said that he found a clump of hair stuck to the ceiling. He testified that when he went outside, Mr. Duffield asked him what kind of gun he found. He stated that when he told Mr. Duffield that he found a snub-nosed .38, Mr. Duffield was very upset and responded, "My God, it's my gun."

On cross-examination, Officer Toungette stated that he did not notice any blood on the handle of the gun. He admitted that the doors could have been locked without a key by someone exiting. He also stated that the clump of hair on the ceiling was located above the defendant's head, and it appeared to be the defendant's hair.

The defendant's father, Chester Duffield, testified that he did not know that the defendant and the victim were having marital problems until the defendant asked him to help her move. He said that his wife told him that the defendant was moving out because the victim's friends threatened to harm her if she was not out of the house by Sunday afternoon. He stated that he drove his truck to the home of the defendant and victim, they loaded it up, and then he drove it back to his house in Nashville. He stated that while they were at his house, the defendant took a .38 caliber pistol from his car without his permission and that it was loaded with a mixture of bullets. He said that when he questioned her about it in front of the victim, she said that she took the gun because the victim's drunk friends were going to be at their house when they went back, and she did not want them to beat her. He said that the defendant knew a little about firearms and that she had shot before. He said that he tried to persuade the defendant not to go back to the house, but she said that she needed to go back to get her work clothes for the next morning. Mr. Duffield said that when the defendant did not come home that night, he told his wife to call her. He said that when his wife talked to the defendant, the defendant said that everything was fine.

3

Mr. Duffield testified that he went to the defendant's house the next morning when she did not show up for work. He said that he blew the horn and yelled, but there was no response. He stated that he noticed somebody washing a car next door, and then he saw that person go into the defendant's house. Because this scared him, he went to a market and someone called the police for him. Mr. Duffield stated that he met with Sheriff Toungette, and they traveled back to the home of the defendant and victim. He said that after Sheriff Toungette found the bodies and told him that the defendant was still breathing, he went back to Nashville to tell his wife, and they went to Vanderbilt Hospital where the defendant was being treated. He said that the defendant remained at Vanderbilt for several weeks, and she was later transferred to Stallworth Rehabilitation Clinic. He stated that because of the defendant's head wound, she had to relearn everything, and it was probably one and one-half months before she could talk. He said that the defendant could not remember anything about the shooting, and she did not remember him or the victim until she was told who they were.

On cross-examination, Mr. Duffield stated that the victim was not his usual self on the day of the move. He said that the victim was short with him. He also testified about an incident that the defendant related to him regarding a struggle between herself and Tommy Howard,[1] a friend of the victim, over a picture of Mr. Duffield that Howard was trying to tear. He said that the defendant told him that if anything ever happened to her, he should look for John Wallace and Tommy Howard. He stated that when the defendant returned from Stallworth to live with him and his wife in Nashville, often she had difficulty sleeping at night because she feared that someone was trying to break into the house. He stated that the doctors at Vanderbilt told him that the defendant may never regain her memory of the shooting.

---

[1] His full name is Tommy Howard Forrester, and he is referred to as Tommy Forrester by other witnesses.

4

Steve Watkins, an agent with the Tennessee Bureau of Investigation, testified that when he arrived at the scene at about 1:45 p.m. on September 12, the defendant had already been transported to the hospital. He stated that his job was to secure the scene until the agents from the crime lab arrived. He stated that a gunshot residue test was performed on both the defendant and the victim but that the results were inconclusive. He said that for a bullet wound to enter behind the left ear and deposit gunpowder inside the left ear, as it did to the victim, the barrel of the discharging weapon would have to have been an undetermined distance from the head rather than a contact wound. He stated that he took Mr. Duffield's statement and that Mr. Duffield did not mention that he saw someone run into the house that morning.

On cross-examination, Mr. Watkins stated that the gun was tested for the presence of blood, but the handle may not have been tested. He said that he spoke with the doctors at Vanderbilt Hospital and that no determination could be made as to the distance from the barrel of the gun to the defendant's head when the shot was fired. He said that the defendant's gunshot wound was at the top left of her head.

Agent Steve Scott with the firearms identification section of the TBI crime lab stated that he collected evidence from the Leming house. He stated that when he arrived, the defendant had already been transported to the hospital. He said that he picked up lead fragments in the bedroom and recovered a bullet inside the victim's pillow on the bed. He said that he cut the bloody palm print out of the wall, as well as bloody fingerprints that were on an adjacent wall. He said that he removed the clump of hair from the ceiling and retrieved the gun. He testified that the gun had two fired cartridge cases in it and three unfired cartridges in the cylinder. He said that the bullets were made by three different manufacturers. He stated that the fired cartridges came from the gun found at the scene and that the bullet retrieved from the pillow was fired from the gun. He said that he could not conclusively match the bullet from the victim's

head to the gun. He also said that he found unfired shot pellets from a shotgun that he deemed unrelated to this case. He said that neither the bloody palm print nor the fingerprints could be matched. Finally, he stated that although the trajectory of the defendant's bullet could not be determined, he was able to determine that the first shot fired was the shot to the victim.

John Wallace testified that he was one of the victim's best friends and had known him since 1989. He said that before the victim started working as a guard at Turney Center, they worked together at Riverbend Maximum Security Institution. He said that he had known the defendant for about two years. He said that when he and the victim worked together at Riverbend, the defendant called the victim several times every day. He stated that the victim called him Thursday night before the shooting and asked if he could bring his guns over to Wallace's house. He said that when he asked the victim why he wanted to bring his guns over, the victim said, "I'm afraid of her and don't know what she'll do," and he then said, "That bitch took my f---ing .357."

On cross-examination, Wallace stated that he had liked the defendant at one time. He said that he and Tommy Forrester were cousins. He said that he was not aware that the defendant thought that he and Forrester were bad influences on her husband, although he admitted that previously he had told a TBI investigator that he knew what the defendant thought. He said that the victim stopped by his house three or four times each week and that they would drink beer. He said that sometimes they would drink at the victim's house but not as often. He said that the defendant cared a great deal about the victim, but he could not tell if the victim loved the defendant. He said that he had never brandished a gun on the defendant and was not aware of any ill feelings between the defendant and Forrester. He admitted that he and the victim had a falling out in 1994 because he thought the victim may have helped his ex-wife leave him, but he said that he had apologized to the victim.

Tommy Forrester testified that he met the victim through Wallace and that he had known him about six months before he died. He said that he had been to the victim's house about four times and that he and the defendant had met a couple of times. He said that he rode to Wallace's wedding with the defendant, and he had no problems with her or the victim. He said that he had never threatened either of them.

On cross-examination, he stated that he did not know that the defendant was concerned about the amount of time the victim was spending drinking with him and Wallace. He said that he was with Wallace on Sunday before the shootings, but he could not remember where they went. He said that it was possible that they went by the victim's house, but he did not remember stopping there. He admitted that he told Agent Watkins that he had not been by the victim's house that day. On redirect, Forrester stated that he was at home Sunday night.

Sandra Buck, a neighbor of the defendant and victim, testified that she saw the defendant and the victim moving on Sunday afternoon. She said that the defendant seemed to be in good spirits. She said that she did not hear any shots Sunday evening. She said that she and her husband were not at home Monday morning, but her son had stopped by to borrow their lawnmower.

Dr. Charles Harlan, the medical examiner, performed the autopsy on the victim. He said that the victim died instantly from the gunshot wound that entered behind his left ear and passed through the brain. He said that he retrieved a .38 caliber bullet from the victim's skull. He said that it was a near gunshot wound, meaning that the muzzle was twelve to twenty-four inches from the victim's skin when the shot was fired. He said that the victim could not have made the bloody handprint on the wall because the gunshot wound would have rendered him unconscious immediately, and

7

he would not have had any control over his motions. He also said that for that reason, the defendant could not have thrown anything across the room after he was shot.

Patricia Duffield, the defendant's mother, testified that the defendant worked with her at Al Phillips' Insurance Agency before the shooting. She said that when she saw the defendant at Vanderbilt Hospital, she noticed bruises on the inside of the defendant's arms. She said that the defendant did not know her the first day but that she recognized her after that day. She said that the defendant's thinking was very slow at first but that she had been able to communicate better as the months passed. She said that the defendant was working as a receptionist at the time of the trial. She said that she had urged the defendant to tell her about the shooting, but the defendant could not remember anything.

Mrs. Duffield testified that she and her husband helped the defendant move out of the house she shared with the victim on Sunday before the shootings. She said that the victim was very angry, which was not like him, but she did not interfere. She said that after they finished putting up boxes in Nashville, the defendant and the victim left to go back to their house in McEwen. She said that the defendant called her twice that night. She said that during the first conversation, the defendant told her that the victim had taken up for her in front of his friends. She said that the defendant said, "He told them that just because I'm not going to be here, that there wasn't going to be a swinging door for them to run in and out of." Mrs. Duffield stated that based upon her conversation with the defendant, she believed that the defendant was speaking about the victim's friends, John Wallace and Tommy Forrester. She testified that the defendant called her again before 9:00 p.m. and said, "So far so good. They're fixing to leave." She said that in the background she could hear the victim talking to another person and that she believed somebody else was there. She said that the defendant told her, "Everything is going to be okay. It's all right, right now."

8

On cross-examination, Mrs. Duffield said that she assumed that the purse underneath the bed was the defendant's. She also said that the pistol lying next to the purse looked like her husband's.

Agent Steve Watkins was called back to the stand to identify the report of the gunshot residue tests performed on both the defendant and the victim. On cross-examination, Watkins testified that any type of liquid substance in which a hand was immersed would have a detrimental effect on the reliability of gunshot residue testing. He stated that in the picture of the crime scene of the defendant and the victim, the defendant's hands appeared to be covered with blood. After looking at a photograph of the victim's hands, he said that they did not appear to have blood on them.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support a conviction for either first or second degree murder because no evidence was submitted that would indicate that the defendant exercised the reflection and judgment necessary to support such a conviction. The state argues that the evidence presented at trial showed that the defendant brought the gun home and intentionally, knowingly, and with premeditation shot her husband in the head and killed him.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

9

Viewing the evidence in a light most favorable to the state, we conclude that the evidence is sufficient to support the conviction. The defendant correctly argues that the state's case is purely circumstantial. However, it is well established that circumstantial evidence may be used exclusively to establish guilt for a criminal act. See State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993). Furthermore, the weight of such circumstantial evidence is for the jury to determine. See Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1977). The evidence presented at trial established that the defendant and the victim were separating and that on Sunday, September 11, 1995, the defendant took a loaded pistol from her father's car without permission. The defendant's father tried to persuade the defendant to stay with him that night, but she refused. The following morning, the victim was found dead lying in bed with a gunshot wound to his head. The bullet found in the victim's head came from the defendant's father's gun, the same gun that was found lying on the floor on the defendant's side of the bed. The victim received the first shot fired, which would have rendered him completely immobile. We cannot say that the evidence presented is insufficient to support the jury's finding of guilt.

The defendant further argues that because the case is circumstantial, the jury could not have found that the facts presented excluded every other reasonable theory or hypothesis except that of guilt. Essentially, the defendant argues that the facts did not exclude the possibility that a third party shot both the victim and the defendant. However, whether other reasonable inferences are excluded by the circumstantial evidence is also a question for the jury. See State v. Crawford, 470 S.W.2d 610 (Tenn. 1971). At trial, the defendant presented evidence to suggest that a third party may have committed the shootings, but the jury rejected that evidence in favor of the state's theory. In the light most favorable to the state, the evidence excludes every reasonable hypothesis but that of guilt.

10

## II. COMPETENCE TO STAND TRIAL

The defendant argues that the trial court erred by allowing the trial to go forward even though the defendant was incompetent due to her amnesia surrounding the shootings. The state argues that amnesia, in and of itself, does not constitute incompetency. The state further argues that the defendant was competent because she was functioning and communicating well, could consult with her attorney, and understood the proceedings at trial.

The standard for determining whether a defendant is competent to stand trial is set forth in Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 789 (1960):

> [T]he "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as a factual understanding of the proceedings against him."

Id. The Dusky standard has been adopted in Tennessee. See State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991); State v. Benton, 759 S.W.2d 427, 429 (Tenn. Crim. App. 1988); Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975). The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). On appeal, the trial court's findings are conclusive unless the evidence preponderates otherwise. Id.

The trial court conducted a hearing on April 23, 1996, to determine whether the defendant was competent to stand trial. The defendant submitted medical records from Vanderbilt Hospital that reflected that she had no recollection of the events surrounding the shootings. Counsel for the defendant stated that when he was first retained, he had great difficulty communicating with the defendant, but she had made great progress. The defendant testified that she had no memory of the circumstances surrounding the shooting of herself and the victim and that her parents

11

told her of the victim's death and her injury. The defendant testified that she had no memory of the last six months of her marriage but that she might remember something if asked about it specifically. She said that she had improved in other areas such as speaking, reading, writing, and walking. She said that she continued to receive medical treatment from a neurologist.

On cross-examination, the defendant testified that she was no longer employed and that she lived with her parents. She said that she had been driving since November 1995 and was able to run errands. She said that she was able to read, cook, and clean. The defendant testified that she remembered going to high school and graduating in 1987. She said that she also remembered marrying the victim, attending college, working for three different employers, and having a son in 1989.

The defendant testified that she had discussed with her lawyer the criminal charge of first degree murder and the lesser included offenses of second degree murder and voluntary manslaughter. She said that she knew the consequences she faced if convicted of first degree murder but was not sure about the consequences if she was convicted of a lesser offense. The defendant testified that she had talked with her attorney about possible defenses, such as her husband may have shot her or she may have been acting in self-defense. She said that she remembered that the victim owned guns at the time of the shooting but that she did not know what kind. The defendant testified that she remembered borrowing a gun from her father but she did not remember when. She said that she understood that she might go to jail if convicted but did not know the punishment for first or second degree murder.

Patricia Duffield, the defendant's mother, testified that while at the hospital, she explained to the defendant who the victim was and what had happened. She said that the defendant was at Vanderbilt Hospital for about three weeks and was

12

then transported to Stallworth Rehabilitation Clinic, where she stayed until November 17, 1995. Mrs. Duffield testified that the defendant's communication had improved since she was first in the hospital but that the defendant still had trouble thinking of a word and saying it. Mrs. Duffield testified that the defendant did not remember the events in question.

On cross-examination, Mrs. Duffield said that the defendant was able to drive and do errands but that she did not drive much in heavy traffic. She said that the defendant did not remember how to get to the place she worked before the shooting. Mrs. Duffield testified that much of what the defendant knew she was told by Mr. Duffield and herself. She stated that she had explained to the defendant that she had obtained her father's gun. She said that there was still much that the defendant did not remember. Mrs. Duffield said that she did not know if the defendant remembered the birth of her child and the events of his growing up because they had not talked about them. She said that the defendant was beginning to act normally, but not to the point that she was able to work. Mrs. Duffield stated that although the defendant graduated with a 4.0 grade point average from Branell College and was good at math, the defendant had trouble multiplying and adding.

Mrs. Duffield stated that she had told the defendant that the trial was the next day, but she did not believe that the defendant fully understood the ramifications of a trial. Upon questioning by the trial court, Mrs. Duffield stated that she did not think that the defendant's ability to express herself would improve within four months, the time period for which the case would be delayed if a continuance was granted for a psychological evaluation. She said that she did not know whether the defendant's memory would improve, but she believed that the defendant's communication skills would get better. Mrs. Duffield testified that the defendant's ability to reason and

13

understand, to calculate, and to understand the legal process had not improved. She said that the defendant was more outgoing before the shooting.

Chester Duffield, the defendant's father, testified that he was a retired police officer who stayed at home with the defendant. He said that the defendant's ability to communicate had advanced quickly since she had been home. Mr. Duffield said that he believed it likely that her ability to communicate with her attorney would improve. He stated that her ability to think and to reason had improved in certain areas, but he was unsure that the defendant understood the penalty for the crime charged. He believed that the defendant was capable of understanding the penalty if it was explained to her. He said that the defendant was continuing to improve and was physically stronger but that she was not yet normal. Mr. Duffield stated that her best improvement was that she was relearning things. He said that her ability to think of words and to verbalize her thoughts had improved greatly.

At the end of the hearing, the trial court denied the defendant's motion. Based on the testimony and the defendant's medical records, it found that there was no doubt that the defendant was suffering from amnesia but that there was no medical proof that her condition would ever improve. It found that there were some communication deficits but that they were not significant. The court found that amnesia does not constitute incompetency to stand trial. In support of its holding, the trial court relied upon State v. Dempsey Ray, No. 86-290-III, Davidson County (Tenn. Crim. App. Mar. 2, 1988) (holding that "[a]mnesia in and of itself does not constitute incompetency to stand trial.").

Regarding the proof introduced at trial, the defendant's parents testified that the defendant continued to have problems communicating in that she was unable to think of a word and say it. Mr. and Mrs. Duffield both said that she had never

14

remembered or related to them anything that happened during the time period when the victim was killed. He stated that the defendant had to relearn everything and was undergoing both physical and mental therapy. The defendant's medical records were introduced at trial and documented the defendant's "severe aphasia, making it difficult to assess orientation and cognitive skills" and the language deficits.

The defendant contends that the trial court erred by finding her competent to stand trial. She argues that her amnesia precluded her from assisting counsel, rendering her incompetent to stand trial under the facts of this case. Specifically, the defendant argues that because she was unable to remember anything surrounding the circumstances of the offense and because the evidence was not so compelling as to render her memory unnecessary to assist counsel, a fair trial could not be held.

In analyzing the defendant's claim of incompetence, we first begin with the principle that amnesia, in and of itself, does not constitute incompetency to stand trial. See Ray, slip op. at 7. However, the circumstances of the crime and of the amnesia may be such as to deprive the defendant of a fair trial. Id. We also note that this court has previously rejected a defendant's claim that he was deprived of a fair trial due to his inability to remember the events of the crimes. See State v. Neil M. Friedman, No. 03C01-9704-CR-00140, Carter County (Tenn. Crim. App. Apr. 14, 1998), applic. filed (Tenn. June 15, 1998). An analysis of relevant cases leads us to the conclusion that in order to ensure that an amnesiac defendant receives the guarantees of due process, two inquiries must be made. First, there must be an analysis under Dusky as to whether the defendant has sufficient ability to consult with her attorney with a reasonable degree of rational understanding and whether the defendant understands the proceedings against her. See Dusky, 362 U.S. at 402, 80 S. Ct. at 789. Second, there must be an analysis of whether the defendant can receive a fair trial despite the amnesia, considering such factors as whether the crime and the defendant's

15

whereabouts can be reconstructed without the defendant's testimony and whether access to government files would assist the defendant in preparing a defense. See United States v. Swanson, 572 F.2d 523, 527 (5th Cir. 1978) (cited in Ray, slip op. at 7).

The first inquiry is whether the defendant has sufficient ability to consult with her attorney and whether the defendant understands the proceedings against her. We conclude that this inquiry is satisfied in the instant case. The facts produced at the competency hearing and at trial show that the defendant became able to talk with her attorney and discuss the charges against her. She discussed possible defenses with her attorney, including the possibility that her husband or an intruder shot her. Both her parents and her attorney stated that she had made great improvements in the area of communication. Furthermore, the defendant understood the nature of the charges against her. She stated that although she was unsure about the consequences of being convicted of a lesser offense, she understood that she would go to jail if she were to be convicted of first degree murder. Her father stated that she was capable of understanding the penalty of the crime charged if it were explained to her. Based on these facts, we conclude that the standard for competency set forth in Dusky is satisfied in the instant case.

Our second inquiry is whether the defendant is able to receive a fair trial despite the amnesia. In Ray, this court looked to Swanson for the relevant inquiry in determining an amnesiac defendant's ability to receive a fair trial. A main consideration is whether the crime and the defendant's whereabouts can be reconstructed without her testimony. The evidence presented at trial in the instant case shows that the state was able to reconstruct the shootings without the testimony of the defendant by analyzing the physical evidence and the testimony of the witnesses. The state's theory, based on the physical evidence and the testimony of witnesses, was that the defendant took a

16

loaded pistol from her father without his permission, went back to the house she was formerly sharing with the victim, and some time on September 11 or 12, 1995, shot the victim then herself. Thus, both the events and the defendant's whereabouts could be reasonably reconstructed.

Also, although the state did not provide the defendant with completely open files, as suggested in both Swanson and United States v. Stubblefield, 325 F. Supp. 485, 486 (E.D. Tenn. 1971), the defense made extensive pretrial discovery motions to which the state responded by supplying the defense with the names and addresses of the state's witnesses and access to the evidence presented at trial, including the photographs, the pistol, the section of the wall containing the bloody palm print, hair and tissue, bed clothing, the bullet, bullet fragments, the fingerprint analyses, toxicology reports, and the autopsy report. The state notified the defendant of its intent to call Wallace and Forrester as witnesses, and the defendant was able to construct a theory alternative to the state's theory using these witnesses and the physical evidence. The defense was able to cross-examine both Wallace and Forrester, as well as the agents from the crime lab who assisted the state in preparing its theory of the case. In light of these facts, we conclude that the state gave the defendant sufficient access to information such that the defendant was not deprived of a fair trial.

In conclusion, we affirm the trial court's determination that the defendant is competent to stand trial. Certainly, the presentation of a defense was made more difficult by the defendant's complete lack of memory surrounding the shootings. However, the defendant was able to consult with her attorney, and she understood the nature of the charges against her. Furthermore, the crime itself and the defendant's whereabouts were constructed without the defendant's testimony. In light of these circumstances, we conclude that the defendant's due process rights were not violated by bringing her to trial.

17

## III. HEARSAY STATEMENT

Finally, the defendant argues that the trial court erred by admitting into evidence the victim's statement to John Wallace when Wallace asked the victim why he wanted to bring his guns over to Wallace's house. The trial court allowed Wallace to testify that the victim told him, "Well I'm afraid of her and don't know what she will do." The trial court determined that the statement was admissible under Rule 803(3), Tenn. R. Evid., as a statement of the victim's then existing state of mind. The trial court provided a limiting instruction, stating that the jury could not consider the testimony as proof that the defendant actually killed the victim. However, the trial court told the jury that they could "accept [the testimony], if you believe it, as proof of the fact that she may have been planning or deliberating murder prior to actually committing it."

In admitting the statements, the trial court relied on State v. Charles N. Howell, No. 03C01-9406-CR-00203, Knox County (Tenn. Crim. App. Feb. 12, 1996), app. denied (Tenn. July 9, 1996) (concurring in results only), in which this court upheld the admission of a murder victim's statements expressing fear of the defendant. This court held that the statements were admissible under Rule 803(3), Tenn. R. Evid., as statements of the victim's state of mind and also determined that the statements were relevant because they related to premeditation. Slip op. at 8-9. However, we believe that the trial court's reliance on Howell was misplaced. Not only is the fact that the supreme court concurred only in the results of this court's Howell opinion significant, but our review of the relevant case law and the Advisory Commission Comment to Rule 803(3) leads us to conclude that the statement made by the victim in the instant case is inadmissible hearsay relative to proving the defendant's conduct and mental state.

In State v. Farmer, 927 S.W.2d 582, 595 (Tenn. Crim. App. 1996), this court held that a statement made by a murder victim, reflecting that he and Farmer

18

planned to meet to steal marijuana, was inadmissible under Rule 803(3). Although the state argued that the statement was admissible as evidence of the victim's state of mind relative to his relationship with Farmer, this court determined that the state's real purpose in seeking to admit the statement was to show that the defendant planned to and did meet with the victim. Id. Noting that the Advisory Commission Comment to Rule 803(3) states that the state of mind exception to the hearsay rule "contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception," this court concluded that it was not admissible to show the defendant's conduct. Id.; see also State v. Lucien Samuel Sherrod, No. 01C01-9505-CR-00157, Davidson County (Tenn. Crim. App. Jan. 30, 1997) (statements of a first degree murder victim, expressing fear of the defendant, were not admissible under 803(3) because the statements were offered to prove the defendant's conduct, "and, therefore, his mental state of premeditation."); State v. John Parker Roe, No. 02C01-9702-CR-00054, Shelby County (Tenn. Crim. App. Jan. 12, 1998), applic. filed (Tenn. Mar. 5, 1998) (murder victim's statements were inadmissible hearsay because the statements were offered for the purpose of proving the defendant's premeditation and deliberation).

The same result is warranted in the instant case. Although the state argues that the statement was offered to show the victim's state of mind and to explain why the victim took his guns over to Wallace's house, the trial court's instruction to the jury suggests otherwise. The trial court instructed the jury that the victim's statement could be used to show the defendant's premeditation and deliberation. Rule 803(3) does not encompass such statements. See Advisory Commission Comment, Tenn. R. Evid. 803(3) ("The commission contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception.").

19

We note, as well, that the victim's statement expressing his fears about the defendant would not be relevant for the state's case to prove the defendant's guilt, even if viewed as evidence of the victim's state of mind. In State v. Smith, 868 S.W.2d 561, 573 (Tenn. 1993), our supreme court held that statements made by a murder victim that expressed fear of the defendant were not directly probative of whether the defendant committed murder. Similar reasoning applies in the present case. There was no evidence presented or claim made about the victim's conduct that would make his state of mind as reflected by his statements relevant to an issue on trial.

Having determined that the statement should have been excluded, we must now determine whether the erroneous admission of the statement is harmless. See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a). We conclude that it is not. In Smith, this court determined that although the hearsay statements were admitted in error, the admission of the statements was harmless in light of the proof presented at trial. Smith, 868 S.W.2d at 573. This court determined that "[w]hen one considers the proof of Defendant's previous threats and violent assaults upon the victims, that [the victim] would have been afraid of the Defendant is obvious." Id. This court has made similar determinations in other cases that are factually analogous to Smith. See, e.g., State v. Bragan, 920 S.W.2d 227, 242 (Tenn. Crim. App. 1995) ("there was ample evidence in the record to conclude that the appellant had planned to kill the victim . . . ."); Farmer, 927 S.W.2d at 596 (even without the hearsay statements, "the evidence of the appellant's guilt would simply be overwhelming.").

The facts of the instant case are distinguishable from Smith and its progeny because in the instant case, the evidence falls far short of overwhelming with respect to proof of the defendant's premeditation. Arguably, the fact that the defendant took a loaded gun from her father's truck the day before the shootings could indicate premeditation, even though the defendant's stated purpose for taking the gun was for

protection from the victim's friends, not to do harm to the defendant. Within this framework, though, the victim's hearsay statement, which was admitted with the trial court's instruction to the jury that it could be considered on the issue of premeditation, would be important to the state relative to the defendant's mental state. Under these circumstances, we conclude that the statement's erroneous admission more probably than not affected the verdict. Therefore, we are compelled to reverse and remand the case for a new trial.

In consideration of the foregoing and the record as a whole, we reverse and remand the case for a new trial based on the trial court's erroneous admission of the hearsay statement made by the victim.

_____
Joseph M. Tipton, Judge

_____
David H. Welles, Judge

_____
Joe G. Riley, Judge