IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2018

**STATE OF TENNESSEE v. JEWEL MOSES BESS**

**Appeal from the Circuit Court for Rutherford County**
**No. F-67665  David M. Bragg, Judge**

_____

**No. M2017-01519-CCA-R3-CD**

_____

A Rutherford County grand jury indicted the defendant, Jewel Moses Bess, with first degree murder for the death of his wife, the victim. Following trial, a jury found the defendant guilty as charged, and the trial court imposed a sentence of life imprisonment. On appeal, the defendant challenges the trial court's evidentiary rulings allowing testimony of the victim's intent to end their marriage and the defendant's prior physical abuse of his son. After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

J. Russell Nixon, Murfreesboro, Tennessee, for the appellant, Jewell Moses Bess.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Jennings H. Jones, District Attorney General; and J. Paul Newman, William C. Whitesell, and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On the evening of August 19, 1986, the defendant, Jewel Moses Bess,[1] shot his wife, Deborah Sherfield Bess ("the victim"), in the head after an argument about the

_____

[1] The defendant is also referred to as Jewell Moses Bess, Mosses Bess, Moses Jewell Bess, and Moses Bess throughout the record.

defendant's infidelity. Although the shooting was originally ruled a suicide, several witnesses came forward in 2011, and the defendant was subsequently indicted for one count of first degree murder. Tenn. Code Ann. § 39-2-202 (1986). After a jury trial, the defendant was convicted of first degree murder and sentenced to life imprisonment. At trial, the State presented the following facts for the jury's review.

The victim and the defendant were married in the spring of 1986. They had two daughters during their relationship, and each had three children from prior marriages. The defendant owned property in Rutherford County he referred to as "Moses Mountain," where he frequently held parties. Drugs, alcohol, guns, and fighting were commonplace, even among the children.

Prior to her death, the victim began to express her dissatisfaction with her marriage to the defendant. The victim was the defendant's "maid, his sex slave." She was responsible for cleaning, cooking, and raising the children. In addition, the victim discovered the defendant was having an affair with a woman named Sandra Coleman, who often attended parties on "Moses Mountain."

When Robin Croy, the victim's friend, observed the victim tell the defendant that she was leaving him, the defendant responded, "b****, you will die before you take my kids." Another day, Ms. Croy went with the victim to look for apartments. When they returned to "Moses Mountain," the defendant "came flying out the door," and "dragged the victim out [of the car] by the hair," pulling her into the trailer. Ms. Croy refused to leave before verifying the victim was okay, and when she saw the victim ten minutes later, the side of the victim's face was "swelled up" and it "looked like [there was] a handprint on her face." Another of the victim's friends, Joani Bush offered to let the victim stay with her because "[the victim] was physically scared of [the defendant]." Eventually, the victim decided to rent a trailer from her mother-in-law. However, when Ms. Croy and the victim began to move items into the new trailer, the defendant confronted them, threatening that he would hate to see Ms. Croy's "daughter without a mother." The victim also told her oldest daughter, Staci Morgan, that she was going to take all of the children with her when she left, including the defendant's three sons.

During the summer of 1986, the victim began working at Cracker Barrel to buy the children new clothes for school and to save enough money to move out. She told her co-workers, Sue Burchell, Christine Creech, and Angela Faulk, that she planned to leave the defendant. After she told Ms. Burchell she was leaving the defendant, Ms. Burchell suggested the victim apply for Section 8 housing and food stamps to afford living on her own. The day before she died, the victim told Ms. Creech "she wasn't happy. She was scared of her husband. She was going to go home and ask him for a divorce." That same day, the victim told Ms. Faulk "she was going home to leave [the defendant]."

On the morning of August 19, 1986, the victim was "happy" and "normal" when she had coffee with her neighbor, Loretta Ewing. She then took the children to register for school and to pick up school clothes that had been placed on layaway. The victim later asked Michael Bess, the defendant's oldest son, if he knew where the defendant's gun was located. She wanted to shoot the tires on the defendant's truck to prevent him from going to the bar. Mr. Bess, however, did not tell her where the gun was kept. The victim also told Mr. Bess it was "time for her to go" and "she was going to take [the children] with her."

After dinner, Mr. Bess heard the defendant and the victim in their bedroom, arguing about the defendant's infidelity. The victim told the defendant to "go back to the bar to [be with the defendant's] whore," Ms. Coleman. Mr. Bess, who was fifteen-years-old at the time, and his two younger brothers crept closer to the defendant's bedroom to listen to the argument. Although there were no lights on in the bedroom, Mr. Bess could see what was happening due to a light from inside the closet. The defendant told the victim he was "going to f****** kill [her]," grabbing the victim by her hair and placing his .44 magnum under her chin. Although the victim was holding a bayonet in her hand, she did not raise it to defend herself. The victim lifted her other hand to push the gun away as the defendant pulled the trigger, and Mr. Bess saw a "blood cloud" as "[the victim's] brains and stuff" filled the room. Mr. Bess then ran into the bedroom and grabbed his eighteen-month-old sister, lying on the bed in her mother's blood. The defendant told Mr. Bess to go to Charles Ewing's house and call 9-1-1. Jami Sherfield, the victim's teenage daughter, was in bed when she heard the gunshot and went with her step-brothers to the Ewing's house next door.

Ms. Ewing was standing outside her home when the children told her to call 9-1-1 because the victim had been shot. Charles Ewing and Mr. Bess then went back to the defendant's home, where the defendant told Mr. Ewing that he "F'd up." The men told Mr. Bess to wait outside for the police. However, Mr. Bess went back into the bedroom and saw the defendant and Mr. Ewing standing over the victim's body, placing the gun in her hands. When they heard the police sirens, the defendant handed Mr. Ewing the bloody sheets from the bed, and Mr. Ewing returned to his home, telling Ms. Ewing to wash the sheets and his bloodied pants.

Glenn Morton was employed by the Rutherford County Sheriff's Department in 1986. On the night of the shooting, he responded to a call at the defendant's home at approximately 10:30 p.m. where he encountered the defendant standing on the front porch smoking a cigarette. The defendant had "chunks of human tissue and blood" stuck in his beard, and he told Officer Morton the victim had shot herself. Officer Morton entered the residence with another officer, Deputy Gage, to check on the victim, but it

was obvious the victim was deceased. The officers exited the residence and secured the scene. Detective Rick Deal, the lead investigator, arrived a short time later and took over the investigation.

Detective Randy Groce, a detective with the Rutherford County Sheriff's Department since April 1986, assisted Detective Deal in the investigation of the victim's death, processing the body at the morgue and assisting in the interview of the defendant. During the interview, the defendant appeared calm, telling the detectives that his wife said she loved him, asked him to take care of the children, and then shot herself. No one other than the defendant was interviewed in connection with the investigation, including the children who were in the home when the shooting occurred or Ms. Ewing, who called 9-1-1. In addition, there was no investigation into the relationship of the defendant and the victim, and the investigation was subsequently closed as a suicide.

Shortly after the victim's death was ruled a suicide, the defendant began to confess that he had, in fact, killed the victim, providing various reasons for the murder. The day after the shooting, Nathan Barrett spoke with the defendant, who admitted he killed the victim "because she was fixing to leave." The defendant told Elizabeth Adams he killed the victim because she was cheating on him. Karl Trover met the defendant in 1987, when he went to the defendant's house to purchase marijuana. The defendant placed his finger underneath Mr. Trover's chin and confessed he "blew [the victim's] f****** brains out." Myra Elizabeth Newbern visited the defendant's home several times in the 1990's with her aunt, who was dating the defendant at the time. Ms. Newbern heard the defendant tell her aunt if she cheated on him, "he would kill her like he did his ex-wife" stating he "put a gun to [the victim's] mouth and shot her."

In addition to confessing to the victim's murder, the defendant used her death to threaten those who questioned him. When Ms. Croy confronted the defendant about her suspicions regarding the victim's death, he told her to "keep [her] mouth shut or [her] baby would grow up without a mom." The defendant also warned Ms. Bush that "something could happen to [Ms. Croy] like what happened to [the victim]." The defendant threatened Virginia Johnson, who purchased drugs from the defendant, that she "would end up like his wife" if she ever told the police where she obtained the drugs.

The defendant also seemed to enjoy showing off the blood-soaked ceiling in the bedroom and a piece of the victim's jaw, which he kept in a jar. After the shooting, Ms. Bush went to the defendant's home where he showed her the "blood and brain matter" on the ceiling and floor. Ms. Croy went into the master bedroom sometime later and observed an American flag hanging over the blood. She also saw a jar with the victim's jaw in it. Lori Gregory attended parties on "Moses Mountain" after the victim's death, and the defendant showed her parts of the victim's skull and jaw that he kept in mason

jars. A month after the victim's death, the defendant took Ms. Ewing into his bedroom and showed her the victim's jaw bone, noting the victim "would always be with him." Deborah Wyrich Riveiro lived near the defendant for two years. The defendant would "get all excited" and ask her to come see the blood on his bedroom ceiling.

In 2011, while in jail, Michael Bess approached police about the victim's death, stating he had witnessed the defendant shoot the victim in the head. Mr. Bess remained silent until 2011 because he was afraid of the defendant. When Mr. Bess was a child, the defendant would beat him "with boards or sticks" and would "whoop us with rings with his hands." This abuse occurred on a regular basis, beginning when he was young and ending when the victim moved in with them. The defendant had also spoken frequently about his days as a "tunnel rat" in Vietnam, and Mr. Bess had seen ears the defendant collected from his victims and mailed back home. The defendant warned Mr. Bess that "he would kill [him] like he did those in Vietnam."

On cross-examination, Mr. Bess acknowledged there were details in his testimony at trial that were absent from his police statement in 2011. However, he was adamant that his statements did not contradict each other and that his memory was clearer now because he was no longer addicted to drugs.

Detective Dan Goodwin, a cold case investigator with the Rutherford County Sheriff's Department, began receiving calls in 2011 about the victim's death. He interviewed several of the victim's friends and acquaintances, who detailed both the victim's intention to leave the defendant and the defendant's frequent confessions of murdering his wife. In addition, the defendant gave two statements to Detective Goodwin, reiterating his claim that the victim had committed suicide. The defendant also stated he was not having an affair with Sandra Coleman at the time of the victim's death.

Teri Arney, a special agent forensic scientist with the TBI, analyzed a small bullet fragment found at the scene. She described the fragment as a piece of the copper jacket from a fired bullet. Because the fragment was so small and did not have "defined edges of the groove impression," Agent Arney was unable to determine what caliber of gun was used to fire the bullet. However, it is the standard of the industry for any caliber larger than .22 to have a copper jacket, and the bullet could have been fired from a .44 Magnum, such as the one owned by the defendant.

Russell Davis, a special agent forensic scientist with the TBI, analyzed a gunshot residue test performed on the victim after her death. The victim's left palm and the back of her left hand had elements indicative of gunshot residue, while her right hand had low levels of gunshot residue materials. These results indicate the victim "could have fired, handled, or was near a gun when it fired." However, the results do not exclude the

possibility that the gun was fired by another individual. Agent Davis did not know if a gunshot residue test was performed on the defendant at the time of the shooting.

A stipulation of fact was entered into proof which introduced the victim's toxicology report prepared by Millicent Yeargin, a special agent forensic scientist with the TBI. The toxicology report indicated the victim had a BAC of .13 at the time of her death. However, the victim's blood tested negative for illicit drugs.

Dr. James Sidney Alexander, an expert in the field of suicide risk assessment, opined the victim did not commit suicide. Dr. Alexander used both suicide risk factors and protective factors in coming to this conclusion. Although he acknowledged there was not enough concrete information to fully evaluate many of the factors, the victim's actions in preparation of leaving her unhappy marriage and her propensity to care for her children led him to believe she was at a low risk for suicide. Instead, in his opinion, her risk for possible homicide was much greater. In addition, while a blood alcohol concentration ("BAC") of .13 would likely cause slurred speech, decreased coordination, and a loss of inhibitions, it is not indicative of an increased suicide risk.

The defendant called Dr. Bernard Charles Ihrig, Gretchen Cruz, Thor Coleman, Charles Ewing, Detective Dan Goodwin, Dr. Gregory Davis, Mildred Bess Parker, and Deputy Chief Virgil Gammon as witnesses.

Dr. Ihrig, an expert in suicidal behavior, testified it is impossible to unequivocally determine whether the victim committed suicide based on the lack of available information and the inability to interview the victim. He also noted between thirty and forty percent of suicides occur in front of other individuals, often as an attention seeking gesture or a sign of anger. However, on cross-examination, Dr. Ihrig acknowledged it is relatively rare for a mother to commit suicide in front of her own child.

Gretchen Cruz, the defendant's niece, was at the defendant's house the day after the victim's death. The defendant offered to show her the bedroom ceiling and some teeth he was holding, but she refused. In 2011, Ms. Cruz spoke with Detective Goodwin, stating she did not believe the victim killed herself because she could not imagine a mother killing herself in front of her child. On cross-examination, Ms. Cruz stated the victim was always caring for the children while the defendant partied with his friends.

Thor Coleman, the defendant's son with Sandra Coleman, spoke with his half-brother, Mr. Bess, who told him that he would "do anything in the world to get out of jail." Mr. Coleman also heard a rumor that Mr. Bess placed a hit on the defendant in prison. On cross-examination, Mr. Coleman acknowledged he was not aware of whether Mr. Bess asked for a deal in consideration for testifying against the defendant.

Charles Ewing, the defendant's neighbor on the day of the shooting, stated he heard a gunshot while working in his shop on August 19, 1986. He walked down to the defendant's house and found the defendant sitting on the front porch. The defendant told Mr. Ewing the victim shot herself after an argument. Mr. Ewing saw the victim's body in the bedroom, but did not touch anything before exiting the room. He did not see Michael Bess at the house that night, and denied helping the defendant move the victim's body or place the gun in her hand. The day after the shooting, the defendant handed Mr. Ewing the bloody sheets from the bed and asked him to wash them.

On cross-examination, Mr. Ewing stated the defendant was telling people he needed to get rid of the victim before she died. He also acknowledged the defendant gave him the bloody sheets before the police arrived. He then took them home and asked his wife, Ms. Ewing, to wash them. The defendant later told him that he had "gotten away with murder." On redirect examination, Mr. Ewing confirmed he received the bloody sheets several days after the shooting and stated he was confused when the State questioned him on cross-examination. However, on recross-examination, Mr. Ewing again stated the defendant gave him the sheets on the night the victim died.

Detective Dan Goodwin acknowledged there were photographs missing from the original case file and that Detective Deal did not mention a bayonet in his report. However, on cross-examination, Detective Goodwin opined the original investigation was poorly done based on the failure to interview additional witnesses and investigate the relationship between the victim and the defendant.

Dr. Gregory J. Davis, an expert in forensic pathology and toxicology, testified there is not enough evidence to determine the victim's manner of death, and he would classify the victim's death as undetermined. Dr. Davis described the victim's gunshot wound as a contact wound, which is more common in suicides than in homicides because most people will try to push a gun away when it is pressed against their skin. On cross-examination, Dr. Davis acknowledged that a person with a BAC of .13 would suffer from reduced reaction times and would be less likely to protect themselves from violence.

Mildred Bess Parker, the defendant's sister, saw the victim the morning of her death. The victim asked Ms. Parker to watch Modesta, her youngest daughter, because she was going to Florida. Ms. Parker also saw the victim take several pills that day, although she did not know what kind of pills they were.

Virgil Gammon, the Deputy Chief at the Rutherford County Sheriff's Department, responded to the defendant's house on the night of the victim's death. However, he did not recall whether he saw the body in the bedroom before it was moved. He also could

not recall whether he saw a gun or bayonet that night. He stated that in a normal investigation the entire crime scene would be photographed and any evidence would be tagged. Deputy Chief Gammon described Detective Deal, the lead investigator during the original investigation, as a competent investigator. He also noted the file would not have been closed if important items were missing without an explanation.

On cross-examination, Deputy Chief Gammon acknowledged the defendant was the only person interviewed in connection with the original investigation, and the defendant could have a self-serving interest in saying the victim shot herself. Deputy Chief Gammon also explained that several old case files had missing items due to several moves and a flood.

The defendant testified on his own behalf, asserting the victim committed suicide in front of him, despite bragging about killing her. He stated he has "little man syndrome" and often boasts to make himself appear tougher. The night of her death, the victim told the defendant that she loved him. He said he loved her too, and the victim pulled the trigger and shot herself. He told his sons to go to the Ewing's house to call 9-1-1 and did not see them for the rest of the night. He disputed much of the testimony given by the other witnesses, denying he would have been upset if the victim asked for a divorce because they had only been married for a few months. He also disputed Mr. Ewing's testimony that the defendant gave him the bloody sheets to wash. The defendant stated he washed the sheets himself after Detective Deal allowed him to re-enter the room. The defendant denied Ms. Croy's allegation that he hit the victim, stating he would never hit her. On cross-examination, the defendant acknowledged Mr. Ewing did come to his house the night of the victim's death. However, he was not sure how Mr. Ewing got blood on his pants because he did not go into the bedroom.

After hearing closing arguments, being charged, and deliberating, the jury found the defendant guilty of first degree murder. The trial court subsequently sentenced the defendant to life imprisonment. The defendant filed a motion for a new trial, in part arguing the trial court erred in allowing testimony of the victim's future intent to leave the defendant and in allowing Mr. Bess to testify to childhood beatings by the defendant. The trial court denied the motion, and this timely appeal followed.

### Analysis

### I.     Hearsay

The defendant first argues the trial court erred in admitting hearsay testimony of the victim's plans to leave the defendant. The defendant contends, because the victim's mental state was not at issue during the trial, the state of mind exception to the hearsay

rule was not applicable. In addition, he argues the statements were used only to show a motive for the defendant to have committed murder. The State contends the statements were properly admitted under the state of mind exception to the hearsay rule. We agree with the State.

At trial, Sue Burchell testified the victim stated several times that she was leaving the defendant. Christine Creech testified the victim was not happy and she was "scared of her husband" and "going to go home and ask him for a divorce" on the day before her death. Robin Croy testified the victim expressed she was "ready to leave." The victim planned to take her children and find a place of her own. Staci Morgan, the victim's oldest daughter, testified the victim intended to leave the defendant and take all of the children with her, even the defendant's sons. Angela Faulk testified that on the day before her death, the victim told Ms. Faulk she was "going home to leave" the defendant. The defendant objected to each of these statements, arguing they were hearsay. The trial court overruled the objections, allowing the evidence to be admitted as statements of future intent under 803(3).

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is inadmissible, but there are numerous exceptions to this rule, including an exception for statements of the declarant's then existing state of mind, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. Tenn. R. Evid. 802 and 803(3). "[D]eclarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3), Advisory Comm'n Cmt. A trial court's findings of fact and credibility determinations regarding hearsay are binding on this Court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). However, determinations regarding whether a statement is hearsay and whether a hearsay exception applies are questions of law and subject to de novo review. *Id*. Finally, questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard. *State v. Howard*, 504 S.W.3d 260, 276 (Tenn. 2016).

The defendant argues the evidence was inadmissible under 803(3) because it was used to show that the defendant had motive to kill the victim. However, a careful review of the record reveals the State offered the evidence to prove the victim's conduct on the night of her death of telling the defendant that she was leaving. The State specifically asked each witness about their knowledge of the victim's future intent and used the elicited testimony to establish the victim's intent and plan to leave the defendant and take the children with her. Two of the witnesses, Christine Creech and Angela Faulk, testified the victim told them the day before her death of her plan to leave the defendant. These

statements were relevant as proof of her subsequent conduct consistent with her established mental state. *See State v. Trusty*, 326 S.W.3d 582, 603 (Tenn. Crim. App. 2010) (holding the victim's statements made shortly before her death were admissible under the state of mind exception to prove her "probable mental state and behavior at the time of her death").

The defendant further argues the victim's mental state was not at issue because the State, not the defendant, first raised the issue of suicide in its opening statement. However, contrary to the defendant's assertion, the defendant first raised the idea of suicide on the night of the victim's death when he told responding officers his wife shot herself. In addition, it is clear from the record the defendant's entire trial strategy consisted of convincing the jury the victim committed suicide, thus, placing her mental state at issue. *See State v. Danny Owens*, No. M2012-02717-CCA-R3-CD, 2014 WL 1173371, *18 (Tenn. Crim. App. Mar. 24, 2014), *perm. app. denied* (Tenn. Sept. 25, 2014) ("[T]he victim's mental state was particularly significant in this case because the jury had to determine whether her death was the result of homicide or suicide.").

Moreover, the defendant's reliance on *State v. Leming*, 3 S.W.3d 7 (Tenn. Crim. App. 1998), is misguided. In *Leming*, the defendant was accused of murdering her husband. At trial, a witness testified the victim said he was afraid of the defendant. The trial judge issued a limiting instruction, stating the jury could not consider the testimony as proof the defendant murdered the victim. However, the jury could accept the testimony as proof the defendant planned or deliberated the murder prior to committing it. On appeal, this Court held the statement could not be used to prove the defendant's premeditation. *State v. Leming*, 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998). In addition, this Court found the victim's state of mind was not relevant to an issue at trial. *Id.* Unlike *Leming*, the trial court in the defendant's case never instructed the jury to consider the victim's statements as proof of the defendant's conduct. Also, as previously discussed, the victim's state of mind was at issue in this case due to the defendant's insistence that the victim committed suicide. The defendant is not entitled to relief on this issue.

The defendant also briefly argues the admission of this testimony violated his right to confrontation. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. However, this issue was not properly supported by argument and is, therefore, waived. Tenn. Ct. Crim. App. R. 10(b).

## II.    Prior Bad Acts

The defendant next argues the trial court erred in allowing Michael Bess to testify to childhood beatings perpetrated by the defendant. The defendant contends the beatings

- 10 -

were too remote in time to have any relevance and the probative value was outweighed by the danger of unfair prejudice. The State argues the trial court exercised proper discretion in allowing the testimony. We agree with the State.

Rule 404(b) of the Tennessee Rules of Evidence generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Id*. The rule sets out certain procedural requirements the trial court must follow:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The comments to Rule 404(b) provide that evidence of other crimes, wrongs, or acts should be excluded unless relevant to an issue other than the character of the defendant, such as identity, motive, intent, or absence of mistake. *Jones*, 450 S.W.3d at 891; *see also* Tenn. R. Evid. 404, Advisory Comm'n. Cmt.

Trial courts are encouraged to take a "restrictive approach [to] [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). In *Dotson*, our Supreme Court explained the policy in favor of exclusion:

The rationale behind the general rule is that admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge . . . . As this Court has consistently cautioned, the jury should not "be tempted to convict based upon a defendant's propensity to commit crimes rather than . . . evidence relating to the charged offense."

- 11 -

*Id*. Provided the trial court substantially complied with the procedure of Rule 404(b), the trial court's decision to admit or exclude evidence will not be overturned on appeal absent an abuse of discretion. *Jones*, 450 S.W.3d at 891. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). If the trial court failed to substantially comply with the strict procedural requirements of Rule 404(b), then no deference is given to the trial court's decision to admit or exclude evidence, and this Court will determine admissibility based on the evidence presented at the jury out hearing. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

On cross-examination, Michael Bess testified he waited to tell police about witnessing the victim's murder because he was afraid of the defendant, his father. On redirect examination, the State asked Mr. Bess why he was afraid of his father. The defendant objected, and the trial court held a jury out hearing to determine whether Mr. Bess's testimony was admissible. During the jury out hearing, Mr. Bess testified he was sexually and physically abused for most of his childhood. The defendant also placed a K.O.S. order on Mr. Bess from prison, which Mr. Bess explained meant "kill on sight." The trial court ruled the testimony regarding past physical abuse was admissible to show why Mr. Bess was afraid of the defendant, to show the defendant's intent to prevent anyone from testifying against him, and to complete the story. The trial court also ruled evidence of prior physical abuse was not more prejudicial than probative. However, to limit unnecessary prejudice, the trial court excluded any testimony regarding past sexual abuse or the kill on sight order, citing the lack of clear and convincing evidence. The trial court substantially complied with the requirements of Rule 404(b) and its ruling will be reviewed for abuse of discretion.

At trial, the defendant repeatedly focused on the length of time between when the shooting occurred and when witnesses began speaking with police, seeking to undermine the credibility of the State's witnesses, including Michael Bess, by asking why they did not come forward sooner. Therefore, testimony of the reason why Mr. Bess was afraid of the defendant was relevant and probative to the issue of his reluctance to speak to police about the defendant. In addition, the probative value of this evidence was not outweighed by the danger of unfair prejudice. The trial court properly excluded evidence of sexual abuse as too prejudicial and the kill on sight order because it lacked clear and convincing evidence.

The defendant also argues the testimony of beatings Mr. Bess endured as a child was too remote in time to be relevant to the victim's death. However, an objection based

on remoteness "affects only the weight, not the admissibility of the evidence." *State v. Smith*, 868 S.W.2d 561, 575 (Tenn. 1993). As such, the trial court acted within its discretion in admitting this evidence. The defendant is not entitled to relief on this issue.

### *Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE