# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
February 16, 2016 Session Heard at Union University[1]

## STATE OF TENNESSEE v. TIMOTHY CLARK NAIFEH

**Appeal from the Circuit Court for Obion County**
**No. CC12CR134     James C. Beasley, Jr., Judge**

_____

**No. W2015-01204-CCA-R3-CD  -  Filed May 27, 2016**

_____

The Defendant, Timothy Clark Naifeh, was convicted by an Obion County jury of six counts of vehicular homicide. Prior to trial, the Defendant filed two motions challenging his competence to stand trial, both of which were denied by the trial court. Following a sentencing hearing, the trial court merged his convictions into three counts of vehicular homicide by intoxication, a Class B felony. See T.C.A. § 39-13-213(a)(1). The sentence was to be served by split confinement, with one year of incarceration and the remainder on probation. On appeal, the Defendant argues that the trial court erred in finding that he was competent to stand trial and that his sentence was improper. Upon our review, we affirm the judgments of the trial court. However, for purposes of clarity, we remand this matter for entry of corrected judgment forms in Counts 1, 2, and 3, specifying an effective sentence of ten years, with one year of incarceration and the remaining nine years on probation.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Charles S. Kelley, Sr., Dyersburg, Tennessee, for the Defendant-Appellant, Timothy Clark Naifeh.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1] Oral Argument was heard in this case on February 16, 2016, at Union University in Jackson, Tennessee, as a part of the S.C.A.L.E.S (Supreme Court Advancing Legal Education for Students) project.

**OPINION**

On January 7, 2012, the Defendant, a licensed defense attorney, crashed his truck into a vehicle occupied by four passengers.[2] Two of the passengers, fifty-one-year-old David Bell and eighty-one-year-old Frances Sue Bell, died immediately upon impact, and a third, eighty-one-year-old Jack Bell, died at the hospital the next morning. The Defendant sustained significant head trauma from the accident and was airlifted to Regional Medical Center in Memphis, Tennessee, where he remained for several weeks. He was later transferred to a rehabilitation facility in Atlanta, Georgia, and then to a nursing home in Lake County, Tennessee, before returning home in April 2012. A toxicology report on the Defendant's blood sample revealed that at the time of the accident, the Defendant was under the influence of multiple prescription drugs, including Valium, Xanax, and Phentermine.[3] The Obion County Grand Jury subsequently indicted the Defendant for three counts of vehicular homicide by intoxication, a Class B felony, and three alternative counts of vehicular homicide by conduct creating a substantial risk of death and serious bodily injury, a Class C felony. See T.C.A. § 39-13-213(a)(1)-(2).

**Competency Proceedings.** On April 19, 2013, the Defendant filed an eighty-seven-page motion challenging his competence to stand trial based on the brain injuries he sustained in the accident. The Defendant's motion was heard on May 23, 2014, by the Criminal Court of Shelby County, sitting by interchange.

**Defendant's Experts.** Dr. Robert Kennon, a licensed psychologist who had performed approximately 150 competency evaluations, met with the Defendant on two occasions in early 2013. The Defendant initially resisted and expressed concern over how the information from Dr. Kennon's evaluation would be used. Dr. Kennon noted that this suspicious reaction was unusual and that criminal defendants exhibiting misleading or malingering behavior tend to be overly cooperative. Despite his initial reluctance, the Defendant submitted to psychological testing by Dr. Kennon over a six and a half hour period. The Defendant exhibited a full scale IQ score of 72 on the Wechsler Adult Intelligence Scale, which placed the Defendant's intellectual level in the bottom three percent of adults his age and indicated "a borderline mild mental retarded classification range of intellectual abilities." The Defendant also scored in the lower one

---

[2] The transcript from the Defendant's jury trial is absent from the appellate record. Thus, we deduce much of the factual background of this case from the trial exhibits, which, interestingly, were included in the record on appeal.

[3] Based on the exhibits from trial, it appears that the Defendant had a prescription for Xanax and Phentermine but not Valium. Moreover, based on the August 11, 2014 correspondence from Forensic Pathologist Dr. Gregory J. Davis, which was also introduced at trial, the Defendant's blood concentrations for both Phentermine and Valium were well above the "therapeutic range."

percent in the subcategory of "processing speed," which reflected "significant problems with attention, concentration, processing information and doing it in a timely manner." On the Wide Range Brain Achievement Test, the Defendant "functioned relatively well" in the categories of reading and spelling, although his reading comprehension level was lower than Dr. Kennon expected. In contrast, the Defendant's math skills were at an eighth grade equivalency level, which Dr. Kennon attributed to the Defendant's inability to concentrate.

On the Wechsler Memory Scale, which specifically tested the Defendant's auditory and visual memory, the Defendant scored in the lower one percent in immediate memory and the lower .3 percent in delayed memory. Dr. Kennon explained that these scores indicated a "moderate[ly] to severely impaired range of functioning in these areas." He further noted that the Defendant fell into the lower .2 percent in visual memory, which was consistent with the right frontal lobe injury to the Defendant's brain. The Defendant also exhibited "significant visual spacial deficits" on the Rey Complex Figure Test, falling in the lower two percent range in immediate memory recall and the lower one percent range in delayed memory recall.

On the Millon Clinical Multiaxial Inventory, an objective true-false test used to assess personality characteristics and psychopathology, the Defendant portrayed himself in a "fairly positive light" and reported that he had no psychological issues. Finally, on the Beck Depression Inventory, a subjective assessment designed to measure a subject's level of depression, the results indicated that the Defendant had mild symptoms of depression. Dr. Kennon testified that the fact that the Defendant did not exaggerate his condition or portray himself as more impaired on either the Millon or Beck inventories suggested that he was not malingering.

Dr. Kennon gave the Defendant a score of thirty-eight out of ninety-nine on the Global Assessment Functioning Scale ("GAF"), which is a "subjective appraisal of an individual's functional capacity." This score indicated "major impairment in his capacity to work, his capacity to handle daily activities, his capacity to make appropriate judgments, his ability to remember information and focus and concentrate." However, Dr. Kennon noted that GAF scores were extremely subjective and had recently been discredited. Dr. Kennon additionally testified that "given the cognitive impairment that [the Defendant] has suffered . . . I found he suffered from retro grade amnesia of th[e] accident." Dr. Kennon ultimately concluded that the Defendant was not competent to stand trial. He added,

> Well, he possesses very poor cognitive - low cognitive function that
> falls in the borderline range. His ability to encode, to retrieve, to remember
> information has also been significantly impacted by this traumatic brain

injury. He possessed limited to no insight as to what happened, what occurred and as a result of that I do not - I found that he was not able to assist his attorney in providing information about or details about the - or for that matter, reliable facts about the incident. That he is disadvantaged due to his – to challenge witnesses. He's not able to recognize distortions in what someone may or may not say. He's not able to encode information about details during the process of a court hearing. I don't think that he possesses the adequate attention and concentration to recall information during a trial. I also do not think that he possesses the capacity to deal with multiple details and to recall that information like the test results I think support that.

. . .

He's overly suspicious and those factors, I think, will also or further the deterrence to his capacity to work with his attorney.

Dr. Kennon opined that the Defendant's condition was unlikely to improve.

On cross-examination, Dr. Kennon testified that the Defendant was fully cooperative with testing despite his original suspiciousness. He also conceded that the Defendant's inability to recall the accident could have been affected by the drugs he was on at the time of the accident. He agreed that the Defendant understood that he was charged with a crime and could go to jail. Moreover, he admitted that the Defendant was able to carry on a coherent conversation and could at least talk to counsel about various issues. He agreed that the major issue with regard to the Defendant's competency to stand trial was the effect the Defendant's impaired memory would have on his ability to assist in preparing a defense. He explained that the Defendant would not be able to challenge witnesses or testify because he could not independently recall anything from the day of the accident. In addition, the Defendant exhibited "disbelief" that three people were killed in the accident, although he remarked on the severity of his own injuries. Dr. Kennon was struck by how "egocentric" the Defendant's account of the accident was, noting "[i]t was very much . . . about [him]" and "very little about anybody else." In response to questions from the trial court, Dr. Kennon recounted the Defendant's description of the accident as follows:

[The Defendant] said, "I was banged up good." He said - I said – "They say I hit somebody head on. I don't know." He said, "It was just a bump." I said, "You mean like a speed bump?" And he said "Yeah, it was just a bump in the road." He said, "May have been a pot hole. I was in a truck. Went to the hospital in a helicopter." He said, "I went to a local

hospital and then was transferred to the MED and after that, different ones."
And he had difficulty telling me which ones.

The trial court interjected and was concerned that the issue of competency was complicated by the fact that the Defendant was a licensed attorney that had practiced criminal law and was reluctant to answer questions that he felt would get him into trouble. In response to the trial court's concerns, Dr. Kennon stated,

> I think he's going to have difficulty comprehending a trial dealing with that information and assembling that and being able to recall what's been said, what's not been said and therefore to assist his attorney in that process. He's not able to because of his lack of recollection whether that's related to substance abuse or to the trauma. I suspect it's trauma. . . . This man suffered severe trauma, head trauma with -- I mean, some of the trauma that he experienced not many people live through that. . . . [B]ecause he's an attorney and I -- I'm with you, I struggle with this greatly. Because of that fact that he's an attorney I would propose to you that some of the behaviors that you're seeing are even further of this – not blatant malingering, but some of the behaviors that you're witnessing with him "I don't want to answer that", I'm hesitant -

> . . . .

> . . . is suggestive of his lack of insight. It's suggestive of poor judgment. That's what I think. I think it's a matter of poor judgment.

Dr. Robert Murray, a psychiatrist, interviewed the Defendant on December 10, 2012, for approximately an hour. After his initial evaluation of the Defendant's mental condition, he closely reviewed the psychological testing performed by Dr. Kennon. Dr. Murray confirmed that he utilized Dr. Kennon's test results to assist in his own evaluation of the Defendant. He noted that Dr. Kennon conducted a standard "mini" mental status exam, which he described as a "very well standardized" evaluation of cognitive function, and that the Defendant scored a seventeen out of thirty. Dr. Murray explained that this score was consistent with substantial impairment and "at least 10 points short of where [the Defendant] should be." He further explained that the Defendant's IQ of 72 was not consistent with his previous level of intelligence as a practicing attorney. Moreover, Dr. Murray agreed that the Defendant's scores on the Wechsler Memory Scale reflected that the Defendant's long-term visual memory had suffered the most significant impairment.

Dr. Murray did not notice any major changes in the Defendant's condition during his second evaluation on February 24, 2014. He observed that the Defendant was "functioning on a reasonable level in terms of knowing where he was and getting around" but that "his gait was clumsy." Dr. Murray explained that the damage to the frontal lobe portion of the Defendant's brain was consistent with memory loss, paranoia, and poor judgment. Dr. Murray also noted that this sort of injury would create "a significant personality change as a result of the trauma," and he opined that the Defendant's condition was unlikely to improve.

Although Dr. Murray did not believe that the Defendant was malingering, he conceded that the Defendant had previously made statements recognizing that participating in testing was not necessarily in his self-interest. He also agreed that notes from Western Mental Health Institute ("WMHI"), the inpatient facility where the State had the Defendant evaluated, reflected that the Defendant made somatic complaints that made it impossible to administer psychological tests. However, he noted that Dr. Kennon found no evidence of misleading behavior and that the tests Dr. Kennon used were designed to detect malingering tendencies. Still, Dr. Murray agreed that "[the Defendant's] understanding of the legal proceedings [was] not bad" and that "the primary issue [was] the lack of memory." Dr. Murray opined that the Defendant's limited retention rendered him incapable of assisting his counsel in the preparation of his defense at trial.

On cross-examination, Dr. Murray admitted that the Defendant generally understood legal workings and stated, "[t]here [were] some ways he understood that better than I do." He conceded that the Defendant was able to carry on a coherent conversation and could at least consult with counsel. He noted, however, that the Defendant's head trauma as well as the Valium in his system at the time of the accident would have led to significant memory loss. Although Dr. Murray acknowledged that the Defendant had a different attitude about being tested by Dr. Kennon than he did about being tested at WMHI, he attributed this variation to the Defendant's poor judgment and paranoia. On redirect, Dr. Murray noted that there would likely be some variability with the Defendant's mental condition even on a daily basis. Finally, in response to questions raised by the trial court, Dr. Murray testified that the Defendant suffered the most memory loss near the time of the accident because his "memory coding system was being derailed" during that interval.

**State's Experts.** Dr. Doug King, a staff psychiatrist at Pathways Behavioral Health Services, met with the Defendant for approximately an hour on May 14, 2013, to assess the Defendant's competency to stand trial. The Defendant was largely cooperative with the evaluation; however, Dr. King noted,

[The Defendant] made a statement, after I explained the purpose of the interview, that some of the things he said might go against him. He did not explicitly state at any time 'I refuse to answer something' or get belligerent about questions. There was one question about illicit drugs and he - his affect changed at that point and I would have to look at my report to know exactly what he said but, he sort of balked at that and said something like he probably should not answer that question.

On May 15, 2013, Dr. King wrote a letter to the trial court that advised, "a more comprehensive evaluation is needed in order to make a determination of [the Defendant's] competency to stand trial," and recommended that the court order a comprehensive inpatient evaluation.

Dr. King felt that the Defendant would be better assessed over a thirty-day period in light of inconsistencies between the Defendant's responses and behavior. Dr. King testified that, although the Defendant claimed that he did not understand the charges against him, the Defendant was aware that he would not face trial if he was found to be incompetent. Moreover, the Defendant was able to remember and articulate details about his family, including his son's upcoming appointment at West Point. Dr. King was surprised that the Defendant could discuss "over learned" details about his family history but had no "over learned knowledge" about courtroom protocol after being an attorney for many years. On cross-examination, Dr. King explained that "over learned knowledge," is "information repeated over and over and integrated into the individual[']s nervous system more than necessary to just retain information. . . . . [I]t becomes automatic, habitual."

In response to questions raised by the trial court, Dr. King testified that he was also surprised that the Defendant was so cordial and articulate after reviewing the Defendant's records. He noted that, although the Defendant gave some indication of short-term memory impairment, he remembered which door led to the lobby from Dr. King's office and remembered that he was supposed to call his brother to pick him up. Dr. King was unable to determine whether the Defendant would benefit from medication; however, he did not believe that the Defendant suffered from depression. Finally, Dr. King noted that high-functioning individuals like the Defendant generally had a better ability to recover from trauma.

Upon Dr. King's recommendation, the trial court ordered that the Defendant submit to a thirty-day, comprehensive inpatient evaluation at WMHI. Dr. Hillary Linder, a staff psychiatrist at WMHI, determined that the Defendant was competent to stand trial based on his interaction with the Defendant during that time. Dr. Linder explained that the Defendant demonstrated problems with his memory and mobility but otherwise

communicated well and got along with others. Dr. Linder testified that the Defendant engaged in normal activities without trouble, showed no signs of paranoia, and remained consistent in his behavior and overall mental status throughout the thirty-day assessment. Dr. Linder did not believe that the Defendant was exhibiting malingering behavior; however, he noted that the Defendant made statements like, "you're not my guy" to the WMHI doctors and refused to answer questions about the accident. Moreover, the Defendant refused to participate in psychological testing because he felt that it was not in his best interest.

On cross-examination, Dr. Linder agreed that the Defendant was generally cooperative but that he refused to speak with them about his evaluation or his memory situation. Dr. Linder disagreed with the findings of Dr. Kennon and "was surprised that [the Defendant] functioned as low on the memory retention as Dr. Kennon sa[id]." He agreed, however, that the WMHI staff had no test results to compare with Dr. Kennon's because the Defendant refused for thirty days to participate in testing. Moreover, although Dr. Linder gave the Defendant a similar GAF score as Dr. Kennon, he explained that GAF scores are inexact and primarily used for people with mental illness rather than people with brain injury related to head trauma. Dr. Linder conceded that the Defendant's CAT scan reviewed multiple hemorrhages in his brain. However, he did not schedule the Defendant to meet with a neuropsychologist because he did not think the Defendant would cooperate with testing. He was unsure of what the results of additional testing would have been and agreed that the Defendant may have hurt himself even more by refusing to participate.

Dr. Suzanne Tauseff, a staff psychologist at WMHI, was a member of the team that evaluated the Defendant and observed the Defendant in both individual and group settings. She testified that the Defendant initially refused to undergo psychological testing because he "fe[lt] that that would not be in his best legal interest" and "might hurt him in terms of his legal charges." However, he eventually became more cordial and began citing various physical issues in order to avoid testing. Likewise, the Defendant would not discuss his accident because he did not feel that it was in his best legal interest, and he seemed unsure of whether his recollection of the event was based on his actual memory or based on things other people had told him.

Dr. Tauseff testified that the Defendant spoke like an attorney and appeared to have a very good understanding of the legal process. She noted that he gave a few nuanced responses indicating that he had retained forensic knowledge from practice, including an explanation of congruent and consecutive sentencing and the benefit of a criminal defendant having twelve jurors, rather than six. Dr. Tauseff noted, however, that the Defendant was inconsistent and that he mostly responded to forensic questioning with, "I don't know" or "I'm not sure." In general, Dr. Tauseff did not have a problem

carrying on a normal conversation with the Defendant and based on her observations, she believed that the Defendant "possess[ed] the requisite capacities for competency to stand trial."

On cross-examination, Dr. Tauseff agreed that most of the tests administered by Dr. Kennon were standardized, although she noted that not all psychologists use the same tests. While there were no neuropsychologists at WMHI, Dr. Tauseff stated that some measure of the Defendant's neuropsychological functioning would be helpful in assessing his memory. However, she thought that any attempt to have the Defendant evaluated by a neuropsychologist would have been futile because he refused to participate in testing. Dr. Tauseff also testified that she did not detect any malingering by the Defendant but that he did use language like "you're not my guy" as an explanation for his noncompliance. Dr. Tauseff acknowledged that the Defendant tested poorly in his prior assessments but noted that "testing is not a magical thing. It's a starting point." She continued,

> [E]ven though [the Defendant's] scores looked very, very low[,] he was still able to navigate socially in a very difficult environment over a thirty day period. Never had any behavioral discontrol and basically educated the team in terms of some of the forensic knowledge that he had. So he had a very high understanding of that . . . material.

Dr. Tauseff explained that behavioral observations and forensic questioning, although not standardized, were very important assessment tools. Moreover, she stated that her unit often found individuals with lower IQ scores than 72 to be competent.

**Defendant's Lay Witnesses.** Cristy Cooper Davis, a former Assistant Public Defender in Dyer County, testified that she met the Defendant in 2005 and that they had rekindled a romantic relationship shortly before the accident in January 2012. The Defendant resided with Davis[4] at her home in Dyersburg for about six months after the accident. Davis explained that the Defendant could eat, shower, and dress himself without help but that he would often forget when he had done so. Davis also observed that the Defendant could not stay focused on the subject matter of a conversation for any extended period or comprehend routine tasks like remembering to take his medication each day. She further testified that the Defendant had no "realistic recollection" of the accident. Based on her background in criminal law and her interactions with the

---

[4] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

Defendant, she did not believe that he could rationally understand the proceedings against him or assist counsel in preparing his defense.

Attorney Jason Creasy met with the Defendant on March 10, 2014, and again on April 22, 2014, in order to assess his competency to stand trial. Although Creasy and the Defendant had previously worked together, the Defendant did not initially recognize Creasy and had no recollection of a high-profile case that they had been working on together at the time of the accident. Moreover, the Defendant had no recollection of anything from the day of his accident and could not answer basic questions about the elements of crimes or legal processes such as jury selection. The Defendant also could not recall events in his life that were unrelated to the case, such as the name of his divorce attorney or the birth dates of his children. Creasy did not believe the Defendant was capable of understanding the proceedings against him or rationally consulting with his attorney. On cross-examination, Creasy conceded that Defendant seemed to understand that he was charged with a criminal offense and that he could be incarcerated if convicted. He agreed that the Defendant could converse with him but felt that the Defendant's memory and concentration issues would make it difficult to build a defense.

James T. Powell, a criminal defense attorney, interviewed the Defendant for two hours in February 2013 to assess whether he could assist in his own defense. Powell questioned him as if he were preparing a defense. The Defendant could not remember the accident or any of the events leading up to it and "did not have a good grasp" on legal processes such as jury selection. Moreover, the Defendant became very agitated when asked if he would testify on his own behalf. Powell did not believe that the Defendant was capable of understanding his charges or assisting his attorney in preparing a defense. On cross-examination, Powell testified that when he asked the Defendant if he understood why he was there, the Defendant responded, "It's something about my driving." Powell noted that although the Defendant "wasn't babbling," he "just didn't have any grasp . . . of what had happened." Furthermore, the Defendant told Powell that he wanted to testify but could not say what, if anything, he would testify to. In response to questions raised by the trial court, Powell testified that the Defendant could not remember a prior occasion when he and Powell had played golf together. On recross-examination, Powell conceded that criminal clients had often lied to him in the past.

Lake County Sheriff Bryan Avery, who had known the Defendant for thirty-five years, noticed a significant difference in the Defendant's demeanor since the accident. For example, he recalled that in the spring of 2013, the Defendant came to the Sheriff's Department and tried to have his mother evicted. Sheriff Avery's brother Kevin Avery, a close friend of the Defendant's, testified that since the accident, the Defendant would lose focus and repeated himself frequently during a conversation. Avery also noted that the Defendant would never have had a pet turtle before but now had two turtles and a snake.

Lake County Mayor Macey Roberson and her assistant secretary, Darlene Jones, long-time friends and colleagues of the Defendant, testified that after his accident, the Defendant had a difficult time carrying on a conversation because he would forget what they were talking about, jump around to different topics, and repeat himself.

Lori Campbell and Amy Howell, both of whom had previously worked for the Defendant, testified similarly that the Defendant could no longer stay focused during a conversation. Campbell noted that the Defendant's brother had to change the door locks at the Defendant's office to keep him from getting inside. Moreover, Howell stated that the Defendant often brought up old cases as if he were still practicing law, could not remember how old his children were, and referred to his pet turtle as his roommate. Vicky Lebo, an employee of Northwest Correctional Complex and long-time friend of the Defendant's, testified that the Defendant would "lose[] track in the middle of a conversation," forget things, and ask her to take him shopping for items he had just bought. Finally, she noted that "[the Defendant's] life pretty much revolves around [his pet] turtle now," and that he would ask her if she thought the turtle was listening when he spoke to it.

Captain Dennis Dean of the Obion County Sheriff's Department served as the administrative officer of the county jail and was present when the Defendant was booked in October of 2012. The Defendant's brother had to assist Captain Dean in booking the Defendant because the Defendant was unable to answer routine questions or provide information such as phone numbers and emergency contacts.

The Defendant's older brother, Dr. James Naifeh, testified that the Defendant was a much higher level functioning person before his accident and that he could no longer practice law or care for his own finances. He further noted the Defendant was now easily angered and often violent toward his family members, particularly his mother and younger brother, Chris. Dr. Naifeh testified that, although the Defendant's intellect was good, he could not rationalize or make decisions because there was no longer a connection between certain parts of his brain.

Chris Naifeh, the Defendant's younger brother, testified that he was appointed the Defendant's conservator two months after the accident and that he had the most contact with the Defendant. He recalled one occasion where the Defendant abruptly exited a restaurant where they were eating and attempted to walk back to his home in Tiptonville. Naifeh said that he had to "manhandle" the Defendant and physically carry him back inside the nursing home facility where he resided at the time. Naifeh further testified that the Defendant would often become agitated and violent toward him and their elderly mother, and Naifeh believed the Defendant's irate behavior stemmed from his brain injury.

**State's Rebuttal Lay Witness.** Susan Wallace, the Defendant's ex-wife, testified that she and the Defendant were married for thirteen years, had three children together, and still spoke regularly. Three weeks prior to the competency hearing, the Defendant called and asked her to testify on his behalf. At that time, the Defendant also told Wallace that he remembered the accident, and she described their conversation, in relevant part, as follows:

> I said, "Do you remember?" And he said, "Yes." And I said, "What happened that day?" I said, "Did you fall asleep? You were texting with Cristy Cooper? . . . [W]ere [you] texting her back? What made you cross that center line?"
>
> . . . .
>
> And he told me that his attorney and he had decided that they would go with sleep apnea, that he was suffering from sleep apnea and that's the reason why he crossed the line.

Following closing remarks by counsel, the trial court took the matter under advisement to determine whether additional testimony regarding the Defendant's competency was necessary. In a written order issued on August 25, 2014, the trial court found that the Defendant was competent to stand trial.

**Renewed Motion to Declare the Defendant Incompetent to Stand Trial.** On September 17, 2014, the Defendant filed a second motion challenging his competency to stand trial, wherein he claimed that he had sustained further physical and mental injury since the first hearing. The renewed motion was heard on November 25, 2014. Dr. James Naifeh testified that the Defendant passed out during a hunting trip with his son on August 24, 2014. The Defendant was transported by ambulance to Dyersburg Regional Medical Center and remained hospitalized there for several days before being transferred to Jackson-Madison County Hospital for additional treatment. He eventually moved to a nursing rehabilitation center in Ridgely, Tennessee, for approximately one month.

After the Defendant was released, a follow-up MRI was taken of his brain. The MRI revealed damage to his frontal lobe, but the radiologist could not determine whether this injury was new or old.[5] However, the MRI also revealed a new stroke that was not detected prior to the Defendant's hospitalization in August 2014. Dr. Naifeh testified that

---

[5] Notably, the report on a CAT scan taken on August 23, 2014, which is attached as an exhibit to the Defendant's original motion to reconsider, identifies the Defendant's right frontal lobe damage as an "Old right frontal infraction."

the Defendant's memory and ambulation had declined since the August stroke, noting, "He stumbles, he stutters." Dr. Naifeh explained that a stroke could affect numerous neurological issues and that it affects each person differently. However, he conceded that a stroke could disturb movement and speech without affecting mental issues and that the damage to the Defendant's right frontal lobe, which controls "thinking [and] thought processes," was consistent with his previous injuries from the accident. Moreover, he testified that the Defendant suffered from sleep apnea and had been prescribed a CPAP machine after the accident to help him breathe at night.

On cross-examination, Dr. Naifeh testified that the Defendant was living at home and was "functional." He confirmed that the Defendant still had difficulty walking but was not bedridden. He noted that he was planning to consult a neurologist to evaluate the Defendant's mental condition but had not yet made an appointment. Although he was sure that the Defendant had suffered a recent stroke in the left basal ganglia portion of his brain, he was unsure of what that portion of the brain does. Dr. Naifeh also testified that the Defendant had suffered cerebral atrophy or shrinkage of brain matter.

At the conclusion of the hearing, the trial court orally denied the Defendant's motion to reconsider, and a written order was filed on January 9, 2015. In its reasoning, the court expressed concern over the Defendant's worsening physical condition but ultimately determined that the Defendant was competent to stand trial. The trial court subsequently granted the Defendant's request to file an application for an interlocutory appeal of the competency determination pursuant Rule 9 of the Tennessee Rules of Appellate Procedure. See Tenn. R. App. P. 9(a). On April 17, 2015, this court denied the Defendant's application. The Defendant's case proceeded to a jury trial, and the Defendant was convicted as charged of six counts of vehicular homicide on May 12, 2015.

**Sentencing Hearing.** At the June 29, 2015 sentencing hearing, the State entered the Defendant's presentence report into evidence. The report reflected that he had a prior conviction for possession of cocaine in June 1992. It also included victim impact statements from seven members of the victims' family. The State then requested enhancement of the Defendant's sentence based on the application of enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. See T.C.A. § 40-35-114(10). In support of enhancement, the State noted that several motorists testified at trial that the Defendant nearly struck them before he eventually collided into the victims' vehicle. The State also sought consecutive sentencing under the dangerous offender category. See T.C.A. § 40-35-115(b).

The State then presented four witnesses. First, Obion County Sheriff Jerry Vastbinder testified that he had arranged for the Defendant to serve any sentence of

-13-

incarceration in a Tennessee Department of Correction ("TDOC") special needs facility. Next, Judy Bell, the widow of victim David Bell and daughter-in-law of victims Jack and Frances Sue Bell, testified that the Defendant should be held responsible for his behavior. Addressing the Defendant, she stated,

> You made a decision that you were well aware of. . . . [Y]ou chose to take drugs. You are a man that was well-educated, that was an attorney for Tennessee. You knew the consequences of your behavior. You chose to ignore them. . . . [Y]ou chose a selfish act that devastated my family.

She further stated that the achievements of her three children had been overshadowed by the death of their father and grandparents and that holidays continued to be difficult. Jonathan Bell, the son of David Bell and grandson of Jack and Frances Sue Bell, testified that he no longer visited his relatives in Tennessee because he associates pain and hardship with the location of the accident. Kathy Bell Gray, the daughter of Jack and Frances Sue Bell and older sister of David Bell, testified, "The people I trusted most in my life are gone." She described the devastating impact of losing three loved ones and pointed out that the Defendant had made no expression of remorse or sorrow for his actions whatsoever. She felt that justice was necessary, would benefit the community, and would "make a better man out of [the Defendant]."

Seven witnesses testified on the Defendant's behalf. Reed Yates, the Mayor of Tiptonville, testified that he had known the Defendant his entire life and that, before the accident, the Defendant had served as the city attorney, the county attorney, and the attorney for Reelfoot Utility District. He said that the Defendant had enjoyed a high character in the community and had a reputation for being honest, charitable, and a great father. Ricky Gooch and Shane Hamilton, longtime friends of the Defendant and his family, testified similarly that the Defendant had a reputation for truth and veracity. Hamilton noted that the Defendant was known for being charitable and was "willing to help anybody[.]" Amy Howell and Lori Campbell, both of whom worked for the Defendant, testified that the Defendant had a reputation for being honest and that he often volunteered for various organizations.

Dr. James Naifeh, the Defendant's older brother, testified that the Defendant had high blood pressure, high cholesterol, brain injuries, and issues with mobility. He emphasized that the Defendant was completely disabled, that his disability would not ever improve, and that he could not return to work as an attorney, drive, or even cook for himself. He further explained that it would be very difficult for the Defendant to adapt to the structure and regulations of a penal institution because he was incapable of following directions due to his memory and processing deficits. He noted that the Defendant was unable to discern when he needs to eat or if he is cold. Dr. Naifeh was unfamiliar with

the TDOC special needs facility and could not render an opinion on how the Defendant would function in that facility.

Chris Naifeh, the Defendant's younger brother, testified that he was primarily responsible for the Defendant's needs and that he saw the Defendant at least every other day. He confirmed that the Defendant was drawing 100 percent disability and that he took care of all of the Defendant's financial affairs. He also stated that the Defendant could not drive and was entirely dependent on others for transportation. Naifeh felt that the Defendant "would never be the same" and that he lost his brother on January 7, 2012. On cross-examination, Naifeh apologized to the family of the victims.

The Defendant, who did not testify, stated, "[I want to] [t]hank the Court for its time and attention. I'm very sorry for what happened. It destroyed lots of lives, and I'm very sorry for what happened."

Following arguments from counsel, the trial court merged the Defendant's convictions into three counts of vehicular homicide by intoxication and imposed a midrange sentence of ten years for each count. The court denied consecutive sentencing but ordered that the Defendant serve one year of incarceration, followed by ten years of probation.[6] The Defendant immediately filed a motion for new trial on June 29, 2015, which was heard and denied that same day.[7] In denying relief, the court again addressed the issue of competency:

> I've had several observations during the course of the proceedings and the trial that give me indication to think that [the Defendant], at least in limited capacity, but has some capacity to understand the proceedings. I've noted throughout that he takes notes. Obviously, I don't know what he's putting on his notes, but it's obvious that he was taking notes, that he had a special interest, at least in one or two of the witnesses who testified that I saw where he positioned himself in the courtroom in a position where he could look at exhibits and some other things that just gave me an impression that he kind of understood what was going on. I've never said that I felt that he was a hundred percent capable of doing everything that you would like for

---

[6] We note that the trial court's language appears inconsistent with its prior imposition of an effective ten-year sentence. However, based on our interpretation of the record, we understand the sentence to be ten years, with one year of service and the remainder on probation. See infra Part II.

[7] It appears from the record that there was a brief recess during the sentencing hearing, at which time defense counsel, for expediency purposes, submitted a motion for new trial to be heard in the same proceeding.

-15-

a client to do, but I did find that there was enough, in my opinion, legally, to find that he was competent to assist counsel[.]

This timely appeal followed.

## ANALYSIS

**I. Competency Determination.** On appeal, the Defendant, citing Dusky v. United States, 362 U.S. 402 (1960) (per curiam) and State v. Harrison, 270 S.W.3d 21 (Tenn. 2008), contends that the trial court erred in finding that he was competent to stand trial. He maintains that, based on the evidence presented at both competency hearings, his mental condition did not satisfy the legal competency standard. He emphasizes that he was unable to work, to drive, to handle his own finances, to follow instructions, or to carry on a consistent conversation, and that he was receiving disability benefits for his injuries. Upon review, we conclude that the trial court did not err in finding that the Defendant was competent to stand trial.

"[T]he Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent." State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000) (citing Pate v. Robinson, 383 U.S. 375, 385 (1966); Berndt v. State, 733 S.W.2d 119 (Tenn. Crim. App. 1987)). In Dusky, the United States Supreme Court articulated the test for competency to stand trial as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him." Dusky, 362 U.S. at 402; see also Blackstock, 19 S.W.3d at 205. Our supreme court, adopting the Dusky factors, held that "[t]he standard for determining competency to stand trial is whether the accused has 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)); see also Harrison, 270 S.W.3d at 33. The burden of establishing incompetence to stand trial rests with the defendant, and the defendant must establish his incompetency by a preponderance of the evidence. See State v. Reid, 164 S.W.3d 286, 307 (Tenn. 2005); State v. Leming, 3 S.W.3d 7, 13-14 (Tenn. Crim. App. 1998). "The trial court's findings 'are conclusive on appeal unless the evidence preponderates otherwise.'" Reid, 164 S.W.3d at 306 (quoting State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)).

"Amnesia in and of itself does not constitute incompetency to stand trial." Leming, 3 S.W.3d at 16; (citing State v. Dempsey Ray, No. 86-290-III, 1988 WL 18350, at *4 (Tenn. Crim. App., at Nashville, Mar. 2, 1988)); see also State v. Neil M. Friedman, No. 03C01-9704-CR-00140, 1998 WL 170133, at *2-4 (Tenn. Crim. App., at Knoxville,

Apr. 14, 1998) (rejecting a defendant's claim that he was deprived of a fair trial due to his inability to remember the events of the crimes). Where memory is at issue in determining competency, two inquiries must be made to ensure that a defendant receives the guarantees of due process. Leming, 3 S.W.3d at 16. First, the trial court must analyze whether the defendant's level of competency satisfies the Dusky factors. Id. (citing Dusky, 362 U.S. at 402). "Second, there must be an analysis of whether the defendant can receive a fair trial despite the amnesia, considering such factors as whether the crime and the defendant's whereabouts can be reconstructed without the defendant's testimony and whether access to government files would assist the defendant in preparing a defense." Id. (citing United States v. Swanson, 572 F.2d 523, 527 (5th Cir. 1978); Dempsey Ray, 1988 WL 18350, at *7).

In denying the Defendant's first incompetency motion, the trial court noted that both of the Defendant's experts conceded that the Defendant possessed at least a general understanding of the legal proceedings against him as well as the ability to converse with his counsel. The court further noted that two of the State's experts, Dr. Linder and Dr. Touseff, determined that the Defendant met the legal competency standard based on their personal observations of the Defendant during his thirty-day inpatient assessment at WMHI. Furthermore, despite extensive testimony from the Defendant's lay witnesses regarding his mental and physical deterioration, the trial court emphasized that the Defendant was a licensed attorney and pointed to instances where "[the Defendant's] answers to questions and comments to witnesses indicate[d] that he still ha[d] a rational understanding of the proceedings against him." The trial court also credited the rebuttal lay testimony from the Defendant's ex-wife, who stated that the Defendant told her several weeks prior to the competency hearing that he remembered the accident and planned to assert a defense of sleep apnea. Based on the proof, the trial court determined "that [the Defendant] ha[d] a rational understanding of the proceedings against him and the ability to consult with his attorney, thereby satisfying the Dusky requirements." The court acknowledged the Defendant's diminished mental condition, noting that "[i]t may be difficult and it may take time to explain issues to him," but nonetheless thought "that [the Defendant] [was] capable of understanding the issues and discussing them with his attorney." Moreover, the trial court adopted the same reasoning in denying the Defendant's second incompetency motion. Although the court expressed concern over the Defendant's physical deterioration, it determined that no major changes in his mental condition had occurred. Consequently, the trial court ultimately found that, based on the expert proof, the only dispositive issue regarding the Defendant's competency was the effect of his impaired memory on his ability to assist in his defense. See Harrison, 270 S.W.3d at 33.

The record does not preponderate against the finding of the trial court. The expert proof reflects that the Defendant was not cooperative with testing administered by the

-17-

State and made various statements recognizing that answering the questions posed by the State's experts was not in his best self-interest. Moreover, both the Defendant's and State's experts consistently testified the Defendant understood various legal processes and could carry on a conversation with an attorney. The Defendant's experts conceded that the primary issue regarding the Defendant's competency to stand trial was his impaired memory. Although the Defendant emphasizes the testimony of various lay witnesses, including criminal defense attorneys, about the potential impact of his diminished intellectual ability at trial, the expert proof reflects that the Defendant met the competency prongs of Dusky.

We must now review whether the Defendant's impaired memory impacted his ability to assist in his defense to such an extent that he was not competent to stand trial. See Leming, 3 S.W.3d at 16. The trial court determined that the Defendant's inability to recall the accident did not amount to incompetence because the degree of his amnesia did not hinder his ability to establish a defense. The court reasoned:

> Will the defendant's input to counsel and/or testimony even make much of a difference? . . . The Court has not heard the proof but my understanding is that the issue is not going to be identity or how the accident actually happened but rather the cause. All of the factual issues can be provided by the State and the Court would order the State to make all statements of witnesses and investigative reports available to defense counsel. The Court is not aware of the defense theory but based upon testimony so far two theories appear to be possible, ingestion of valium or sleep apnea. Both of those theories can be put forth without the defendant's testimony. Although it may be difficult to consult with, explain to and analyze issues with the defendant the Court feels under the law it is possible. The defendant has the burden to establish incompetence by a preponderance of the evidence . . . [and] [t]he Court feels that burden has not been met.

Here, the record does not reflect, and the Defendant does not show, that the trial court's determination was erroneous. Our review of this issue is hindered by the fact that the Defendant failed to include a transcript of the jury trial in the record on appeal. At oral argument, defense counsel advised the court that not including the transcript was intentional. He did not believe it was necessary for the resolution of the issues raised in this appeal. We disagree. It is extremely difficult, if not impossible, to determine what effect, if any, that the Defendant's impaired memory had on preparing his defense at trial without a transcript of his jury trial in the appellate record. We do not know the strategies employed by the defense, the defense theory, or how the evidence adduced at trial could have been impacted by the Defendant's condition. Ordinarily, without a transcript, we are left to presume that the trial court was correct. State v. Bibbs, 806

-18-

S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979) ("In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence."); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). However, in this case, the Defendant has also failed to provide any argument or produce any evidence demonstrating how his inability to recall the accident rendered him incompetent to assist in his defense. Finally, defense counsel conceded during oral argument that the Defendant's inability to assist in his defense ultimately made no difference in the outcome at trial. Accordingly, the Defendant is not entitled to relief on this issue.

**II. Sentencing.** The Defendant also argues that his sentence was improper. First, he contends that the trial court erred by enhancing his sentence from eight to ten years based on a theory of general deterrence not supported by the record. Moreover, he maintains that the trial court wrongly denied a sentence of full probation. The State responds that the Defendant has waived consideration of issues related to sentencing by failing to include the trial transcripts in the record on appeal. The State further asserts that, waiver notwithstanding, the Defendant's sentence was proper. Upon review, we agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, the misapplication of enhancement or mitigating factors does not invalidate the imposed sentence "unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). "A court only abuses its discretion when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" State v. Sihapanya, -- S.W.3d -- , No. W2012-00716-SC-R11-CD, 2014 WL 2466054, at *2 (Tenn. Apr. 30, 2014) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). The defendant has the burden of showing the impropriety of the sentence on appeal. T.C.A. § 40-35-401(d), Sentencing Comm'n Cmts.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b)(1)-(7). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5). A court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

As Range I, standard offender, the Defendant was subject to a sentencing range of eight to twelve years for each of his three convictions for vehicular homicide by intoxication, a Class B felony. See T.C.A. § 40-35-112(a)(2). Thus, the trial court's sentence was well within the statutory range. However, the Defendant argues that the trial court improperly enhanced his sentence to ten years based on the need for "general deterrence." He maintains that the record did not support enhancement and that the State otherwise failed to show that enhancement was appropriate. Despite the Defendant's contentions, it is clear from the record that the court carefully weighed the relevant statutory factors, as well as the sentencing principles, in determining the length of the Defendant's sentence. Although the trial court prefaced its analysis with an extensive discussion about the seriousness of driving under the influence, it is clear that the court also relied on the application of enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high, as a basis for imposing a ten-year sentence. See T.C.A. § 40-35-114(10).

The Defendant does not challenge the trial court's reliance on enhancement factor (10) and, to the extent that the trial court's reliance stemmed from evidence introduced at trial, the Defendant has waived consideration of such by failing to include the trial transcript in the appellate record. Nevertheless, we conclude that the record adequately

supports the trial court's application of enhancement factor (10). Here, it is undisputed that the Defendant operated his vehicle while under the influence of multiple drugs, at least one of which was not prescribed, which resulted in the death of three people as well as significant injury to the Defendant himself. The fact that the Defendant was an experienced defense attorney made this factor particularly significant, as he fully understood the potential consequences of driving while impaired. Although the court applied one mitigating factor in light of the Defendant's brain damage, it was within the discretion of the court to determine the weight to afford each factor. We note that we are bound to a trial court's imposition of a within-range sentence that is otherwise consistent with the purposes and principles of the Sentencing Act. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Moreover, because the statutory enhancement and mitigating factors are advisory only, and because "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion[,]" we conclude that the trial court did not err in its sentencing determinations because the record supports the within-range sentences imposed. See T.C.A. § 40-35-114(c)(2) (2010); Carter, 254 S.W.3d at 345.

Next, the Defendant argues that the trial court should have imposed a sentence of full probation rather than imposing one year of incarceration. He maintains that confinement is inappropriate "based on the unrebutted proof that [the Defendant] needs regular medical care, and is not capable of following the rules and structure of a penal institution." Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn.

-21-

Crim. App. 1996). "A defendant's sentence is based on 'the nature of the offense and the totality of the circumstances in which it was committed, including the defendant's background.'" State v. Trotter, 201 S.W.3d 651, 653 (Tenn. 2006) (quoting Ashby, 823 S.W.2d at 168). The seriousness of the offense alone may justify a trial court's denial of alternative sentencing. See Trotter, 201 S.W.3d at 655. Following the 2005 amendments to the Sentencing Act, a defendant is no longer entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347.

Here, the Defendant was eligible for probation because each sentence was ten years or less and because the offenses were not specifically excluded by statute. See T.C.A. § 40-35-303(a); State v. Langston, 708 S.W.2d 830, 832-33 (Tenn. 1986) (concluding that a defendant is eligible for probation if each sentence is ten years or less regardless of the effective sentence). However, an eligible defendant "is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b), Sentencing Comm'n Cmts. Although the trial court shall automatically consider probation as a sentencing alternative for eligible defendants, the defendant bears the burden of proving his or her suitability for probation. Id. The defendant must demonstrate that probation would serve "the ends of justice and the best interests of both the public and the defendant." State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted). When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978)). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." Sihapanya, 2014 WL 2466054, at *3.

We conclude that the trial court did not abuse its discretion by denying full probation. Although the Defendant references his injuries and his history of being a good citizen, he puts forth no legal basis for why this would otherwise entitle him to a sentence of full probation. Nevertheless, the record reflects that trial court carefully analyzed the propriety of an alternative sentence in light of the circumstances of the Defendant's case. Because the Defendant's sentence resulted from his convictions for Class B felonies, he is not a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102. In addition, the trial court determined that the facts surrounding the offense, and the nature of the Defendant's criminal conduct weighed against probation. Further, the court noted that the crimes involved numerous victims and emphasized the emotional impact that the Defendant's criminal behavior had on the victims. The court also found that incarceration was necessary because a sentence of full probation would unduly depreciate

the seriousness of the offense. Because the trial court properly considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a within-range sentence of ten years, with one year to be served in confinement, the Defendant has failed to establish that his sentence was improper.

Finally, although not raised by either on appeal, there are inconsistencies on the judgment forms. Although the trial court imposed an effective sentence of ten years, the court later ordered that the Defendant "serve one year in prison, followed by 10 years of probation." Similarly, on the judgment forms for Counts 1, 2, and 3, under the section entitled "Sentencing Length," the trial court listed the Defendant's sentence as "10 Years," but handwrote "10 years to serve 1 year in jail followed by 10 years of probation" in the "Special Conditions" section of the judgment form. The trial court listed that the Defendant serve a twelve-month period of incarceration prior to his release on probation but nonetheless listed the length of probation as ten years "when not in jail." Despite these linguistic inconsistencies, we conclude that the trial court meant to impose an effective sentence of ten, rather than eleven years. This is particularly so given that a sentence greater than ten years would render the Defendant ineligible for an alternative sentence. See T.C.A. § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less."). This was clearly not the intention of the trial court. Thus, for clarity, we remand this matter for entry of corrected judgment forms in Counts 1, 2, and 3, reflecting a total effective sentence of ten years in the TDOC, suspended to split confinement with twelve months of incarceration at the Obion County jail and the remaining nine years on probation. See T.C.A. § 40-35-306(a) ("A defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse[.]"); see also T.C.A. § 40-35-319(a), Sentencing Cmm'n Cmts.

## CONCLUSION

Upon review, we affirm the judgments of the trial court. However, we remand this matter for entry of corrected judgment forms in Counts 1, 2, and 3, consistent with this opinion.

_____
CAMILLE R. McMULLEN, JUDGE

-23-